UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

KEYBANC CAPITAL MARKETS, INC.,

                    Plaintiff,

          -v-

EXTREME STEEL, INC., EXTREME
CRAIN & RIGGING, INC., AND
EXTREME RENTAL USA, LLC,

                    Defendants.

---

23-cv-8535 (JSR)

OPINION & ORDER

---

JED S. RAKOFF, U.S.D.J.:

This is a breach of contract action brought by an investment bank against its former client seeking payment of fees allegedly owed to the bank pursuant to an engagement agreement. Plaintiff Keybanc Capital Markets, Inc. ("Keybanc") claims that it entered into an agreement (the "Engagement Agreement") to act as financial advisor to defendants in connection with the sale of a material portion of defendants' business, and that after such a sale concluded, defendants refused to pay plaintiff the amounts owed under the agreement. Keybanc asserts claims for breach of contract, *quantum meruit*, and unjust enrichment.

After the close of discovery, the parties filed cross-motions for summary judgment. Resolution of these motions turns on the interpretation and application of two key terms of the Engagement Agreement: what "financial advice and assistance" Keybanc was required to provide and whether the sales that occurred constituted a "Transaction" that triggered defendants' payment obligation. For the

1

reasons explained below, the Court grants summary judgment for plaintiff Keybanc on its breach of contract claim and denies defendants' cross-motion.

## I.    Factual and Procedural Background

Plaintiff Keybanc is an Ohio-based investment bank that provides investment advisory and other financial services. *See* Defs. Counter-56.1 Statement (Dkt. 57) ¶¶ 1-2. Defendant Extreme Steel, Inc. ("Extreme Steel") is a steel design, engineering, fabrication, and installation company. *Id.* ¶ 5. Defendant Extreme Crane & Rigging, Inc. ("Extreme Crane") is a provider of crane, rigging, and heavy hauling services. *Id.* ¶ 7. Defendant Extreme Rental USA ("Extreme Rental") is a provider of construction equipment rental services. *Id.* ¶ 9. Defendants collectively comprise the "Extreme Group" (or the "Company" as defined in the Engagement Agreement).

On October 5, 2021, Extreme Group and Keybanc entered into the Engagement Agreement, appointing Keybanc as the "sole and exclusive financial advisor to the Company in connection with a possible Transaction" to sell the Extreme Group businesses. Engagement Agreement (Dkt. 44-1) at 1; Defs. Counter 56.1 Statement (Dkt. 57) ¶ 32. The Engagement Agreement describes the services Keybanc will provide as follows: "During the term of its engagement, KBCM will provide such financial advice and assistance in connection with the Transaction as the Company may reasonably request, which may include searching for potential counterparties, advising and assisting the Company in evaluating the various structures and forms of any

Transaction, assisting the Company in the evaluation of offers and in negotiating the financial aspects of the Transaction." Engagement Agreement (Dkt. 44-1) at 1-2. The Engagement Agreement defines "Company" to collectively include the three defendants and their subsidiaries, and defines "Transaction" to encompass a sale of any "material portion of the business assets, divisions, or securities of the Company." *Id.* at 1.[1]

In exchange for providing these investment advisory services, the Engagement Agreement entitles Keybanc to a "Transaction Fee" "payable in full promptly upon consummation of a Transaction." *Id.* at 2. The amount of the Transaction Fee is "$1.5 million; plus 5.0% of any Transaction Value (as defined [in the Engagement Agreement]) in excess of $67.5 million." *Id.* The Engagement Agreement defines a "Transaction" as follows: "whether in one of or a series of related transactions, the sale, transfer or other disposition, directly or indirectly, of all or a material portion of the business assets, divisions, or securities of the Company, whether by way of merger or consolidation, reorganization, recapitalization or restructuring, tender or exchange offer, negotiated purchase, leveraged buyout, lease or license,

---

[1] Specifically, 'Transaction' means, "whether in one of or a series of related transactions, the sale, transfer or other disposition, directly or indirectly, of all or a material portion of the business assets, divisions, or securities of the Company, whether by way of merger or consolidation, reorganization, recapitalization or restructuring, tender or exchange offer, negotiated purchase, leveraged buyout, lease or license, investment or partnership, joint venture, spin-off, split-off or otherwise." *Id.*

investment or partnership, joint venture, spin-off, split-off or otherwise." *Id.*[2]

Pursuant to the Engagement Agreement, Keybanc performed work for defendants for approximately two years, from July 2021 to July 2023, although the parties vigorously dispute the extent of that work. *See* Defs. Counter 56.1 Statement (Dkt. 57) ¶¶ 55-65. Keybanc claims it "provided extensive financial advisory services to the Extreme Group including, but not limited to, developing and creating marketing materials and financial models, identifying and communicating with potential purchasers and investors, facilitating purchaser due diligence, creating and managing an online 'data room', advising and assisting the Extreme Group in evaluating various structures and forms of potential transactions, and leading and facilitating negotiations and transaction structure discussions." Pls. 56.1 Statement (Dkt. 37) ¶ 55. Defendants claim Keybanc "merely served as a middleman," but did not perform any financial modeling, relied on Extreme Group to provide all relevant information, did not meaningfully facilitate due-diligence, and brought only a handful of buyers to the table. Defs.

---

[2] The Engagement Agreement also entitles Keybanc to reimbursement of "all reasonable out-of-pocket expenses incurred in connection with the performance of its services under this letter agreement." *Id.* at 3. Further, "if the Transaction Fee is not paid in full within five business days following consummation of any Transaction then the Company agrees that it will be responsible for all fees and expenses incurred by KBCM (including reasonable fees and disbursements of KBCM's legal counsel) in connection with any action, suit or proceeding instituted in order to enforce the Company's obligation to pay KBCM the Transaction Fee and/or to reimburse KBCM for expenses as provided by this letter agreement." *Id.*

Counter 56.1 Statement (Dkt. 57) ¶ 55; Shiring Decl. (Dkt. 58) ¶¶ 25-32.

During the term of the Engagement Agreement, Extreme Rental and Extreme Crane were both wholly or partially sold. In July 2022, during the term of the Engagement Agreement, the assets of Extreme Rental were sold to Able Equipment. Defs. Counter 56.1 Statement (Dkt. 57) ¶ 51. The price paid for Extreme Rentals' assets was $7.3 million, although defendants claim that most of these proceeds were used to pay off Extreme Rental's substantial outstanding debts, and as a result, the net cash proceeds to the owners were less than $2 million. *Id.* In October 2022, also during the term of the Engagement Agreement, Mollitiam Holdings, LLC acquired 62.5% of Extreme Crane. *Id.* ¶ 52. Mollitiam paid a total of $10 million in cash and notes, and further agreed to assume $16 million in liabilities. *Id.* The value of the transaction was thus $26 million. *See* Chaney Rpt. (Dkt. 59-1) at 10-11; Pls. 56.1 Statement (Dkt. 48) ¶ 52. Neither of the buyers of these two entities was introduced or brought to the table by Keybanc.

The parties' attempts to sell Extreme Steel -- which is the largest of the three Extreme Group entities -- were less successful, and ultimately no sale occurred. Here, it is undisputed that Keybanc engaged in various efforts to solicit possible buyers, including distributing a Confidential Information Memorandum ("CIM") to approximately 30 potential buyers in May 2022 and distributing another CIM to approximately 450 potential buyers in January 2023. Pls. 56.1 Statement (Dkt. 37) ¶¶ 62, 64-65. However, these efforts produced only

two letters of intent. *See* Shiring Decl. (Dkt. 58) ¶ 28. The parties dispute whose fault this lack of progress -- from the time of engagement to the time of distribution -- really was. Keybanc claims delays were caused by Extreme Groups' non-responsiveness and points out that Extreme Group identified a potential buyer -- Oldham Global -- to whom it granted a seven-month exclusive "lock-up," effectively halting progress on a sale. Danford Decl. (Dkt. 49) ¶¶ 149-52. Defendants claim Keybanc did not effectively reach out to potential buyers and was dilatory in its efforts working with them. Dkt. 56 at 7-8. Ultimately, this dispute is not particularly material to the instant motion.

The only serious potential purchaser of Extreme Steel that Keybanc's efforts produced was Corbel Capital Partners, who executed a letter of intent in March 2023 and proposed an initial potential offer to purchase Extreme Steel. *See* Danford Decl. (Dkt. 49) ¶¶ 124-29. But after further due diligence, including a quality of earnings analysis conducted by Ernst & Young, Corbel executed another letter of intent in May 2023 with an amended offer that was revised downward. *Id*. ¶¶ 120, 125. Extreme Group ultimately declined to accept this downward offer in July 2023. *Id*. ¶¶ 130-133. Extreme Group faults Keybanc for not contesting Ernst & Young's analysis, Shiring Decl. (Dkt. 58) ¶ 29, whereas Keybanc suggests the reason Extreme Group declined this offer was because it had identified growth prospects for Extreme Steel and no longer wished to sell. Danford Decl. (Dkt. 49) ¶¶ 130-31.

When it became clear Extreme Steel was not going to be sold, in August 2023 Keybanc sent an invoice to defendants requesting payment of $1.5 million, plus out-of-pocket expenses, based upon the sales of Extreme Rental and Extreme Crane that occurred during the term of the engagement. Defs. Counter 56.1 Statement (Dkt. 57) ¶ 75. Defendants refused to pay, and sent a letter terminating the Engagement Agreement in October 2023. *See id.* ¶¶ 73, 76. Keybanc brought this action, asserting claims for breach of contract and, in the alternative, *quantum meruit* and unjust enrichment.

Earlier in this litigation, defendants moved to dismiss the complaint, which the Court denied. Defendants argued that the Engagement Agreement was too indefinite to constitute a binding agreement because it (allegedly) did not impose any obligations on Keybanc. Defendants thus argued that any claim for breach of contract failed both as a matter of substance and pursuant to New York's statute of frauds.[3] Because the writing was purportedly inadequate, defendants further argued that plaintiff's quasi-contract claims were also barred by the statute of frauds. The Court denied defendants' motion to dismiss, concluding that, "[b]ased upon the allegations in the complaint, there is little doubt that the parties intended the

---

[3] The Engagement Letter specifies that New York law applies to any disputes arising under the agreement. *See* Engagement Ltr. App. A ¶ 12. The parties likewise presume New York law applies, and the Court will do the same.

Engagement Letter to be an enforceable agreement." Jan. 5, 2024 Opinion (Dkt. 27) at 6.

Following the close of discovery, the parties then filed the instant cross-motions for summary judgment.

## II.  **Legal Standard**

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating the record, the Court "construe[s] the evidence in the light most favorable to the non-moving party and draw[s] all reasonable inferences in [that party's] favor." *Williams v. N.Y.C. Hous. Auth.*, 61 F.4th 55, 68 (2d Cir. 2023). The Court must enter "summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *El-Nahal v. Yassky*, 835 F.3d 248, 252 (2d Cir. 2016) (internal quotation marks omitted).

"[T]he initial question for the court on a motion for summary judgment with respect to a contract claim is whether the contract is unambiguous with respect to the question disputed by the parties." *L. Debenture Tr. Co. v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir. 2010) (internal quotation marks omitted). "An ambiguity exists where the terms of the contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant

of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Id.* at 466. "Interpretation of an unambiguous contract is for the court without a role for the factfinder." *Ezrasons, Inc. v. Travelers Indem. Co.,* 89 F.4th 388, 396 (2d Cir. 2023). "Summary judgment is appropriate in a contract interpretation dispute when the language of the contract provision is wholly unambiguous or when the language is ambiguous and there is relevant extrinsic evidence, but the extrinsic evidence creates no genuine issue of material fact and permits interpretation of the agreement as a matter of law." *In re Toscano*, 799 F. Supp. 2d 230, 240 (E.D.N.Y. 2011) (internal quotation marks omitted).

III. **Analysis**

Defendants move for summary judgment on plaintiff's breach of contract claim, arguing there was no meeting of the minds on two essential terms, and so no enforceable contract exists. *See* Defs. MSJ (Dkt. 42) at 10-15. Plaintiff cross-moves for summary judgment on its contract claim, arguing there is no genuine dispute of fact as to any of the essential elements of its claim. *See generally* Pls. MSJ (Dkt. 47). In opposition to plaintiff's motion, defendants, in addition to reasserting their meeting-of-the-minds argument, also argue there is a genuine dispute of fact as to (a) whether Keybanc materially breached the Engagement Agreement, thereby excusing defendants' performance and (b) whether the sale of Extreme Rental and Extreme Crane constituted a "Transaction" within the meaning of the Engagement Agreement. *See* Defs. Opp. (Dkt. 56) at 10-15. Each argument is discussed in turn.

## A. Meeting of the Minds

Defendants argue the Engagement Agreement is unenforceable, seeking summary judgment on this ground, because there was no meeting of the minds as to two key terms. First, defendants argue that there was no meeting of the minds with respect to the services Keybanc was to perform under the agreement. Defendants cite testimony of their principals -- Kevin Rodney and Jeff Shiring -- regarding the services they expected Keybanc would perform, and contrast this with the testimony of Keybanc's corporate representative Steven Danford, arguing this shows differing understandings of Keybanc's obligations. *See* Defs. MSJ (Dkt. 42) at 11-13. Second, defendants argue that there was no meeting of the minds with respect to what constitutes a sale of a "material portion" of the company for purposes of triggering the agreement's payment obligation. Whereas Rodney and Shiring expressed the belief that only a sale of Extreme Steel would satisfy this standard, plaintiff claims that the sales of Extreme Crane and Extreme Rigging are sufficient.

It is, of course, well settled under New York law, as elsewhere, that an objectively unambiguous contract is enforceable regardless of the parties' subjective understandings of its terms. *See Slatt v. Slatt,* 477 N.E.2d 1099, 1100 (N.Y. 1985) ("Where the intention of the parties is clearly and unambiguously set forth, effect must be given to the intent as indicated by the language used."); *Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*, 361 N.E.2d 999, 1001 (N.Y. 1977) ("In accordance with long-established principles, the existence

of a binding contract is not dependent on the subjective intent of either [party]."). But different rules apply where one or more material terms of the contract are ambiguous and there is evidence that the parties understood them differently, and therefore did not have a genuine "meeting of the minds" when they entered the contract. This doctrine has its roots in the classic case *Raffles v. Wichelhaus*, 159 Eng. Rep. 375 (Ex. 1864). In that case, the "parties 'contracted' for a shipment of cotton to come from Bombay to London aboard the ship Peerless," but at the time of contracting there were two ships both named "Peerless" departing "within two months of each other and each party intended that the cotton be shipped on a different Peerless." *Oswald v. Allen*, 285 F. Supp. 488, 492 (S.D.N.Y. 1968), *aff'd*, 417 F.2d 43 (2d Cir. 1969). Because "neither party had reason to know of the latent ambiguity, the Court held that the minds of the parties had not met and no contract existed." *Id.* Subsequent lower court decisions in New York have expanded the *Raffles* rule, invalidating a contract for lack of meeting of the minds any time (a) a material term is ambiguous, and (b) extrinsic evidence cannot cure the ambiguity but instead shows both parties attached different reasonable meanings to the ambiguous term. *See Gupta v. Univ. of Rochester*, 395 N.Y.S.2d 566, 567 (N.Y. App. Div. 1977) ("Where the offeror, using ambiguous language, reasonably means one thing and the offeree reasonably understands differently, there is no contract."); *Gessin Elec. Contractors, Inc. v. 95 Wall Assocs., LLC*, 903 N.Y.S.2d 26, 28 (N.Y. App. Div. 2010) ("Even if parties intend to be bound by a contract,

it is unenforceable if there is no meeting of the minds, i.e., if the parties understand the contract's material terms differently."); *Computer Assocs. Int'l, Inc. v. U.S. Balloon Mfg. Co.*, 782 N.Y.S.2d 117, 119 (N.Y. App. Div. 2004) ("A contract is unenforceable where there is no meeting of the minds between the parties regarding a material element thereof."); *Prince of Peace Enters., Inc. v. Top Quality Food Mkt., LLC*, 760 F. Supp. 2d 384, 397 (S.D.N.Y. 2011) ("[I]f the Court finds substantial ambiguity regarding whether both parties have mutually assented to all material terms, then the Court can neither find, nor enforce, a contract." (quotation omitted)).

Nonetheless, as the Second Circuit has suggested, the rule applies only to "the small group of exceptional cases in which there is no sensible basis for choosing between conflicting understandings," *Oswald v. Allen*, 417 F.2d 43, 45 (2d Cir. 1969), and that "the essence of the *Raffles* opinion was that neither party had reason to know of the latent ambiguity," *Flower City Painting Contractors, Inc. v. Gumina Constr. Co.*, 591 F.2d 162, 165-66 (2d Cir. 1979). *See also Can. Life Assur. Co. v. Guardian Life Ins. Co. of Am.*, 242 F. Supp. 2d 344, 355-57 (S.D.N.Y. 2003) (stating that the *Raffles* rule applies "only where no sensible ground exists for choosing between conflicting understandings of the contractual language, and where the parties agree to terms that reasonably appear on their face to each of them to be unequivocal but in fact are not"). The *Raffles* rule should be limited to circumstances where "the misunderstanding has its source

12

'in the ambivalence or double meaning [as opposed to the inherent vagueness] of an expression.'" Restatement (Second) of Contracts § 20 Reporters Note to cmt. B (quoting William F. Young, Jr., *Equivocation in the Making of Agreements*, 64 Colum. L. Rev. 619, 646 (1964)).

These limiting principles preclude application of the *Raffles* rule here. The concepts of "financial advice and assistance" (as used in reference to the investment bank) and "material" can be rendered more precise by reference to industry custom and usage, as well as extrinsic evidence, and so this is not a case "where no sensible ground exists for choosing between conflicting understandings." *Can. Life*, 242 F. Supp. 2d at 355-57.

Moreover, both of these terms are intentionally open-ended. To the extent the terms are ambiguous -- and, as set forth below, the Court is not convinced they are -- the parties plainly "had reason to know of the latent ambiguity" at the time the Engagement Agreement was executed. *Flower City Painting*, 591 F.2d at 165-66. And even were the Court to look past this threshold legal deficiency, the Court would still find that defendants' meeting-of-the-minds argument fails because defendants have not shown that the parties had differing understandings of these two terms that were reasonable.

## 1. **Financial Advice and Assistance**

Defendants claim that Extreme Group and Keybanc had fundamentally different understandings of Keybanc's obligation to provide "financial advice and assistance." The fact that these terms are broad does not mean they are ambiguous and therefore the subject of extrinsic

evidence. But even assuming *arguendo* the Court should deem these terms ambiguous, defendants have failed to show that there is a genuine dispute over how the parties understood these terms. In support of their argument, defendants contrast the testimony of Extreme Group's principals Kevin Rodney and Jeff Shiring against the testimony of Keybanc's 30(b)(6) witness Steven Danford, who also worked as an investment banker on the Extreme Group matter. *See* Defs. MSJ (Dkt. 42) at 11-13. However, a close review of the cited materials reveals that the parties did not, in fact, have materially divergent understandings of Keybanc's obligations.

*First,* defendants claim that Extreme Group viewed Keybanc's responsibilities as "bring[ing] potential buyers, engag[ing] with those buyers, and formally tak[ing] Extreme Group through the purchase or acquisition of all companies," whereas Danford viewed these only as "potential responsibilities." Defs. MSJ (Dkt. 42) at 12. But the cited portion of Danford's deposition was discussing a presentation Keybanc had prepared for Extreme Group before Keybanc had even been retained, so it is not surprising he described the responsibilities as "potential." *See* Pls. Counter 56.1 Statement (Dkt. 61) ¶ 31; Danford Dep. (Dkt. 44-5) at 20-28. And describing the responsibility to obtain buyers as "potential" does not diverge from Extreme Group's reading of the agreement, because Keybanc was only required to engage in any activity if requested to do so by Extreme Group. *See* Engagement Agreement (Dkt. 44-1) at 1 ("KBCM will provide such financial advice and assistance in connection with the Transaction as the Company **may**

**reasonably request** . . . ." (emphasis added)). There is no genuine dispute supported by admissible evidence that Keybanc failed to do anything that Extreme Group expressly requested Keybanc to do.

*Second*, defendants supposedly understood that Keybanc had the "responsibility to bring potential buyers to the table," whereas Keybanc supposedly believed it had "no obligation to bring potential buyers to the table." Defs. MSJ (Dkt. 42) at 12-13. When asked whether any of the potential buyers that Keybanc had approached "ended up closing a deal with any of the Extreme Group entities," Danford responded, "No. It was also not required." Danford Dep. (Dkt. 44-5) at 49. Danford was not suggesting that Keybanc had no obligation to help *search* for buyers, as evidenced by the fact that he had just testified that "[Keybanc] approached many buyers about the potential investment." *Id*. Danford was simply expressing the view that Keybanc was not required to introduce the buyer who ultimately closed with Extreme Group in order to be entitled to a fee, which accurately describes the structure of the Engagement Agreement. Given that the Engagement Agreement itself identifies "searching for potential counterparties" as among Keybanc's potential obligations, Keybanc could hardly have believed they were not obligated to do so. Engagement Agreement (Dkt. 44-1) at 1.

*Third*, defendants suggest that they expected that Keybanc would advocate on Extreme Group's behalf in connection with certain valuations of the company, which Keybanc failed to do. *See* Defs. MSJ (Dkt. 42) at 13. Some of the valuations Keybanc supposedly failed to

challenge were specific accounting estimates prepared by Extreme Group
and the accounting firm Keybanc had recommended be retained, Cohen and
Co. *See* Danford Dep. (Dkt. 44-5) at 37:13-19, 42:10-17, 90:12-23. Given
that Keybanc recommended Cohen and Co. be hired to perform accounting
work, and assisted in that process, it was hardly unreasonable for
Keybanc to defer to them on accounting questions. Defendants' other
claim -- that Keybanc took no position on the value of Extreme Group's
assets -- is simply not supported by the testimony cited. *See id.* at
72:8-15.

Ultimately, none of the cited testimony demonstrates that the
parties had materially divergent views as to what services constitute
"financial advice and assistance" that were required of Keybanc under
the Engagement Agreement. Moreover, the contract itself limits such
services to those requested by Extreme Group, and there is no
admissible evidence of Extreme Group requesting services that Keybanc
failed to provide. Defendants have therefore failed to show there was
no "meeting of the minds" on this term, however broadly that concept
is construed.

### 2. Material Portion

Defendants claim that Extreme Group and Keybanc had fundamentally
different understandings as to what constitutes a "material portion"
of Extreme Group's "assets, divisions or securities." Defendants argue
that they believed only the sale of Extreme Steel would constitute a
"material portion," citing to the testimony of Shiring, whereas Keybanc

believed a sale of the other entities was "material," as evidenced by this lawsuit. *See* Defs. MSJ (Dkt. 42) at 13-15.

Defendants' argument fails because, as explained in more detail *infra* Section III.C, the sale of Extreme Crane and Extreme Rental unambiguously constituted a Transaction. Even under defendants' reading of the meeting-of-the-minds doctrine, extrinsic evidence about a party's understanding of an agreement cannot create ambiguity where none exists, as well as where a party's understanding of a contract term is not reasonable. *See Gupta*, 395 N.Y.S.2d at 567. "Material," of course, is a familiar term, defined by Merriam Webster's dictionary as "having real importance" or "significant consequences or relevance." Pls. MSJ (Dkt. 47) at 16. Moreover, defendants fail to show that their understanding of "material portion" is at all reasonable. As Keybanc points out, "there is not a single document or e-mail to corroborate [Shiring's] statement." MSJ Argument Tr. (Dkt. 67) at 4. Accordingly, defendants have failed to show a lack of a meeting of the minds on this term.

## B. **Failure to Perform**

In the alternative, defendants argue Keybanc is not entitled to summary judgment because Keybanc "failed to provide any financial advice or assistance as indicated by the Agreement." Defs. Opp. (Dkt. 56) at 11-13. Defendants' counsel confirmed at oral argument that defendants do *not* argue Keybanc materially breached the agreement, thereby excusing defendants' non-performance. *See* MSJ Argument Tr. (Dkt. 67) at 28-29 ("I'm not arguing the defense of first material

breach."). Rather, defendants argue that "[i]n order to receive the Transaction Fee, KeyBanc must provide 'financial advice and assistance' that has some relation to the sale of a material portion of Extreme Group," which defendants claim Keybanc failed to do. Defs. Opp. (Dkt. 56) at 11. In other words, defendants argue that, as a condition precedent to payment, Keybanc was required to *cause* the sale of a material portion of Extreme Group.

Defendants' argument conflicts with the unambiguous terms of the Engagement Agreement. The Agreement provides that Keybanc is entitled to payment of a Transaction Fee "upon consummation of a Transaction" so long as the Transaction occurs during the term of the engagement or within a year of its termination. Engagement Agreement (Dkt. 44-1) at 1, 3.[4] Nothing in the Engagement Agreement expressly conditions payment of the Transaction Fee upon Keybanc's participation in or solicitation of the underlying Transaction. As previously noted, Keybanc's obligation was to provide "financial advice and assistance in connection with the Transaction as the Company may reasonably request." Engagement Agreement (Dkt. 44-1) at 1. But nothing in the agreement suggests that performance of this obligation was a condition precedent to an entitlement to payment if a Transaction occurs. Furthermore, defendants offer no evidence that they requested Keybanc

---

[4] Indeed, as originally proposed by Keybanc, the Engagement Agreement would have required payment of the Transaction Fee if the Transaction occurred within 18 months of termination, but Shiring amended this portion of the agreement to reduce the so-called "Tail Period" to 12 months. *Id.*; *see* Danford Decl. (Dkt. 49) ¶ 65.

be involved in either the sale of Extreme Rental or the sale of Extreme Crane. To the contrary, Shiring admits in his declaration that Keybanc tried to assist with the sale of Extreme Crane without ever being asked to do so. *See* Shiring Decl. (Dkt. 58) ¶ 28(b) ("Keybanc had minimal communications with Mollitiam Holdings regarding its LOI for Crane & Rigging, not because Extreme Group needed its input (the material terms of the transaction were already negotiated) but because Keybanc asked to be involved.").

Defendants raise various other purported deficiencies with Keybanc in their moving papers. *See* Defs. Opp. (Dkt. 56) at 11-13. But defendants fail to explain how these purported breaches are at all relevant. As noted, defendants do not argue that Keybanc materially breached the agreement in a manner that might excuse defendants' performance. MSJ Argument Tr. (Dkt. 67) at 28-29. Nor have the defendants proffered sufficient evidence to come anywhere near demonstrating that these purported breaches were material. *See Smoley v. Carole Hochman Design Grp., Inc.*, 913 N.Y.S.2d 79, 80 (N.Y. App. Div. 2010) (stating breach is material where it is "so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract"). Finally, even assuming these purported breaches were material, defendants are very likely precluded from raising them as a defense under the doctrine of election of remedies, given that the parties continued to perform after the supposed breaches occurred. *See ARP Films, Inc. v. Marvel Ent. Grp., Inc.*, 952 F.2d 643, 649 (2d Cir. 1991); *City of New York v. New York Pizzeria*, 2006 WL

2850237, at *7 (S.D.N.Y. Sept. 29, 2006) ("When the non-breaching party elects to continue the contract, it is not freed from its obligations under the contract, despite the [other] party's breach.").

## C. **Materiality of Sale**

The final element contested by defendants is the requirement that any transaction involve the sale of a "material portion of the business assets, divisions, or securities" of Extreme Group. Defs. Opp. (Dkt. 56) at 13-15. The Engagement Agreement's payment obligation is triggered by the occurrence of any "Transaction." Engagement Agreement (Dkt. 44-1) at 1-3. A "Transaction" is defined as follows: "whether in one of or a series of related transactions, the sale, transfer or other disposition, directly or indirectly, of all or a **material portion** of the business assets, divisions, or securities of the Company, whether by way of merger or consolidation, reorganization, recapitalization or restructuring, tender or exchange offer, negotiated purchase, leveraged buyout, lease or license, investment or partnership, joint venture, spin-off, split-off or otherwise." *Id.* at 1 (emphasis added). To establish it is entitled to payment, plaintiff therefore must show that the sale of Extreme Crane and/or Extreme Rental constituted the sale of a "material portion" of Extreme Group's "business, assets, divisions, or securities."

Plaintiff argues that the sale of Extreme Crane and Extreme Rental unambiguously constitutes the sale of a "material portion" of Extreme Group, and therefore they triggered the defendants' payment obligation. *See* Pls. MSJ (Dkt. 47) at 20-21; Pls. Reply (Dkt. 63) at

5-7. Defendants respond largely by relying on extrinsic evidence that suggests the parties understood, at the time of contracting, that a "material portion of the business" meant only a transaction involving the sale of Extreme Steel. This dispute raises two related questions: (a) whether the definition of Transaction is ambiguous as applied here and (b) if it is ambiguous, whether the extrinsic evidence is sufficiently compelling to demonstrate there exists a material dispute of fact. Each question is addressed in turn.

If a contractual provision is "clear and unambiguous on its face, it must be enforced according to the plain meaning of its terms" without resort to extrinsic evidence. *Hatalmud v. Spellings*, 505 F.3d 139, 146 (2d Cir. 2007). Merriam Webster's dictionary defines "material" as "having real importance" or "significant consequences or relevance." Pls. MSJ (Dkt. 47) at 16. Defendants' own expert does not dispute this is the meaning of "material." *Id; see also* MSJ Argument Tr. (Dkt. 67) at 22 ("Material means something that's actually significant."). Defendants' own expert concedes that the Extreme Crane and Extreme Rental sales represented between 13.23% to 30.75% of the Company's assets. Chaney Rpt. (Dkt. 59-1) at 10-11; MSJ Argument Tr. (Dkt. 67) at 7. Such a large fraction of a company's assets plainly would have "significant consequence or relevance" to a company.

This understanding of "material" is confirmed when considered in light of industry custom and usage. In the securities law context, any accounting misstatement is treated as presumptively material if it exceeds 5%. *See* SEC Staff Accounting Bulletin No. 99; *Hutchison v.*

21

*Deutsche Bank Sec. Inc.*, 647 F.3d 479, 485 (2d Cir. 2011). Plaintiff's expert, David Epstein, similarly opines that "a threshold of 5% is commonly used to determine materiality" in the accounting context. Epstein Rpt. (Dkt. 50-1) at 8. At least one court has used this 5% threshold to determine whether an asset sale constituted a "material portion" of a company, construing contract language substantively identical to that at issue here. *See Stone Key Partners LLC v. Monster Worldwide, Inc.*, 333 F. Supp. 3d 316, 333-34 (S.D.N.Y. 2018), *aff'd*, 788 F. App'x 50 (2d Cir. 2019). The parties to the instant transaction were both sophisticated investors, and the 5% threshold is widely known within legal circles. While not dispositive, this usage provides further evidence that the sales here -- which were two to six times the threshold, depending on the metric used -- were material.

What is more, even if these sales did not constitute a material portion of the "assets" of the Extreme Group, they certainly constituted a material portion of the "divisions or securities" of it. Two of the company's three business units were sold pursuant to the transactions. While defendants deride this analysis as overly simplistic, *see* Defs. Opp. (Dkt. 56) at 13-14, this reasoning is compelled by the plain language of the Engagement Agreement itself. The Engagement Agreement provides, in the disjunctive, that the sale of a material portion of either the "business, assets, divisions or securities" of Extreme Group triggered the transaction fee. The Court is required, so far as is practicable, to give each of these four words a distinct meaning, lest any one be rendered superfluous. *See*

*L. Debenture Tr. Co.*, 595 F.3d at 468 ("The court should read the integrated contract as a whole to ensure that undue emphasis is not placed upon particular words and phrases and to safeguard against adopting an interpretation that would render any individual provision superfluous." (internal quotation marks omitted)). In order for "divisions or securities" to have some distinct meaning, there must be some circumstance where they apply even where a material portion of the "business" or "assets" was not sold. Thus, even assuming *arguendo* that only a sale of Extreme Steel would constitute the sale a material portion of the "business" or "assets," the sale of Extreme Crane and Extreme Rental constitute a material portion of the "divisions or securities."[5]

---

[5] At oral argument, defendants' counsel argued that the word "divisions" in the Engagement Agreement "doesn't apply," or should not necessarily be given a distinct meaning, because it was merely "boilerplate" and the terms of the contract were not negotiated. MSJ Argument Tr. (Dkt. 67) at 21. This is in line with defendants' more general argument that, because Keybanc drafted the Engagement Agreement, any ambiguities in that document should be construed in defendants' favor. *See* Defs. Opp. (Dkt. 56) at 10. However, the Agreement explicitly states that "[t]here shall be no construction of any provision of the letter agreement against Keybanc because the letter agreement was drafted by Keybanc, and the parties waive any statute or rule of law to such effect." (Dkt. 44-1) App. A ¶ 14. Given that defendants are sophisticated commercial parties, it is not clear the *contra profurentum* rule should apply at all. *See Herskowitz v. Wesley Hills Ctr., LLC*, 162 N.Y.S.3d 750, 751 (N.Y. App. Div. 2022) ("The rule that ambiguous language in a contract will be construed against the drafter is not applicable here, because the agreement resulted from negotiations between commercially sophisticated parties"). But in light of the aforementioned contract provision, the rule is certainly inapplicable. Accordingly, the Court must construe the contract in accordance with ordinary interpretive principles.

Defendants' interpretation -- that only sale of Extreme Steel can constitute a "material portion of the business" -- is also inconsistent with the terms of the agreement and would essentially rewrite the agreement by adding words that are not there. The parties easily could have said, "only sale of Extreme Steel constitutes a material portion of the business" if that is what they meant, but they did not.

Accordingly, the Court finds that the sale of Extreme Crane and Extreme Rental unambiguously constituted a Transaction within the meaning of the Engagement Agreement, thereby triggering the payment obligation.

## IV. <u>Conclusion</u>

For the foregoing reasons, the Court grants summary judgment for plaintiff Keybanc on its breach of contract claim and awards the sum of $1,504,897.00, plus Keybanc's costs and expenses, including reasonable attorneys' fees, of prosecuting its claims against defendants in this action, to be paid by defendants jointly or severally. Keybanc is hereby directed to file a motion proving the amount of such costs and expenses, including reasonable attorneys' fees, by no later than July 8, 2024; defendants my file an opposition contesting the amount of such costs and expenses by no later than July 22, 2024; Keybanc may file a reply in further support of its request by no later than July 29, 2024. Because the Court finds that the Engagement Agreement was an enforceable contract, the Court also dismisses plaintiff's quasi-contract claims for unjust enrichment and

*quantum meruit.* Finally, the Court denies defendants' motion for summary judgment.

The Clerk is respectfully directed to enter judgment and close the case.

SO ORDERED.

New York, NY
June 27, 2024

JED S. RAKOFF, U.S.D.J.